*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MALNAR ESTATE.

---

CHARLENE RITTER, as Personal Representative of the ESTATE OF MATT MALNAR,

UNPUBLISHED
September 5, 2024

    Plaintiff/Counterdefendant-Appellant,

v

No. 366963
Delta Probate Court
LC No. 21-022770-CZ

IVAN MALNAR,

    Defendant/Counterplaintiff-Appellee.

---

Before: SWARTZLE, P.J., and K. F. KELLY and YOUNG, JJ.

PER CURIAM.

In this action to quiet title, plaintiff/counterdefendant, Charlene Ritter, as Personal Representative of the Estate of Matt Malnar, appeals as of right the probate court's June 29, 2023 order granting summary disposition to defendant/counterplaintiff, Ivan Malnar, under MCR 2.116(C)(10) (no genuine dispute of material fact) and denying Ritter's competing motion for summary disposition on defendant's counterclaim under MCR 2.116(C)(10). Ritter seeks reversal of the probate court's order, arguing the court erred in finding that the quitclaim deed granting Ivan title to the disputed property had been delivered. We affirm the probate court's grant of summary disposition to Ivan on Ritter's initial claim to quiet title because the deeds were considered delivered based on the parties' intent and subsequent actions. We also affirm the probate court's denial of summary disposition to Ritter on Ivan's counterclaim because whether Ivan had title to the disputed property by adverse possession is moot.

# I. FACTUAL AND PROCEDURAL HISTORY

This appeal arises from a decades-long dispute in ownership over a 40-acre parcel of land the parties[1] refer to as "the West 1/2." The entire property involved is an 80-acre parcel more particularly described as: "the East 1/2 of the Southeast 1/4 of Section 16, Township 40 North, Range 21 West," but is more commonly referred to throughout the record as "the East 1/2 of the Southeast Quarter of Section 16." To clarify, there is the "West 1/2" of the East 1/2 of the Southeast Quarter of Section 16, the parcel in dispute, and the "East 1/2" of the East 1/2 of the Southeast Quarter of Section 16, ownership of which is settled.

## A. INITIAL CONVEYANCE

Matt Malnar married Helen, and the two had several children, including Ivan, who is married to Jodi Malnar, and Raymond, who is married to Suk Malnar. Ritter is Raymond's daughter. Matt was granted the deed to the entire 80-acre property in fee simple on May 11, 1938. On May 2, 1979, in a deed drafted by Matt's Attorney Robert Hansley, Matt and Helen quitclaimed the East 1/2 of the property to Matt and Ivan "as joint tenants, and not as tenants in common." Ivan testified that after this, Matt put "two or three acres" from the West 1/2 into Ivan's name, and Ivan built a house there which he continues to occupy. Ivan also testified that with Matt's permission, he constructed a sawmill on the West 1/2 in 1970. Matt told Ivan which portions of the West 1/2 would be ideal to build the sawmill.

## B. CORRECTING ERROR IN INITIAL CONVEYANCE

Matt died on February 29, 1988. After Matt's death, title to the East 1/2 passed exclusively to Ivan under the 1979 quitclaim deed. Ivan's attorney at the time, Russell Hall, wrote to him in September 1988, stating: "I have reviewed the problem with the existing deeds and the Last Will of [Matt Malnar]," referring to the 1979 quitclaim deed conveying the East 1/2 to Matt and Ivan as joint tenants. Attorney Hall testified "it was clear there was an error in the legal description" contained in the 1979 quitclaim deed. Attorney Hall's letter recommended the following steps to remedy the error in the 1979 quitclaim deed, which was supposed to convey the West 1/2 to Ivan, not the East 1/2: (1) Ivan was to obtain a quitclaim deed to the West 1/2 from each of Matt's heirs, and (2) Attorney Hall was to draft a Scrivener's Affidavit for Hansley to execute, stating the 1979 quitclaim deed meant to convey the West 1/2, not the East 1/2, to Ivan. The letter stated an additional safeguard would be to probate Matt's estate which purported to contain the East 1/2. Attorney Hall assured Ivan that if those steps were completed, Delta Abstract & Title, the company that was to prepare the deeds from each of Matt's heirs, would be willing to insure title of the West 1/2 in Ivan. Attorney Hall also wrote "in order to give Raymond good title to a portion of the property from the probate estate, [Ivan] would need to execute a quit-claim deed conveying to [Raymond] all of [Ivan's] interest in the East 1/2 . . . ." Finally, Attorney Hall wrote "I have forwarded the quit-claim deeds to you so that you could discuss this with parties prior to executing

---

[1] Because multiple parties share the last name "Malnar," they are referred to by their first names throughout this opinion.

the quit-claim deeds." Attorney Hall did not recall ever drafting a deed conveying the East 1/2 to Raymond.

Another letter from Attorney Hall to Raymond dated August 27, 1990, purports to enclose a quitclaim deed for Raymond to convey his portion of the West 1/2 to Ivan. The next day, August 28, 1990, Attorney Hansley, who drafted the 1979 quitclaim deed conveying the East 1/2 of the property to Matt and Ivan as joint tenants, signed an Affidavit of Scrivener's Error, wherein he averred the 1979 quitclaim deed was meant to convey the West 1/2 of the property, not the East 1/2, to Matt and Ivan. This would have placed ownership of the East 1/2 back to Matt's estate, and granted the West 1/2 to Matt and Ivan as joint tenants, wherein the West 1/2 would pass to Ivan automatically at Matt's death. From August 1990 onward, the parties operated under the assumption that the Scrivener's Affidavit was valid, that Ivan held title to the West 1/2, and Matt's estate held title to the East 1/2.

## C. THE SIX QUITCLAIM DEEDS

In keeping with the recommendations to correct the error in the 1979 quitclaim deed, between 1990 and 1994, Attorney Hall drafted six quitclaim deeds from each of Matt's heirs: (1) Helen, (2) Raymond and Suk, (3) Leonard and Judy Peterson, (4) Michael and Delores Ettenhofer, (5) Leonard and Angie Clemens, and (6) Matt Malnar Jr. and Laurel Malnar. Each of the deeds quitclaimed the heirs' interests in the West 1/2 to Ivan and Jodi as tenants by the entirety. The deeds were drafted by Attorney Hall and sent to each heir. Each deed was fully executed and notarized, but the deeds were never recorded. In a November 5, 1990 letter to Ivan, Attorney Hall wrote that he received two of the "properly executed deeds," one from Matt Jr. and one from Delores Ettenhofer, and asked Ivan to send the quitclaim deeds from the other heirs. Relevant to this appeal, Raymond and Suk Malnar conveyed the West 1/2 by quitclaim deed to Ivan and Jodi as tenants by the entirety on February 17, 1994.

It is unclear from the record if or when all the deeds were sent to Attorney Hall. Attorney Hall testified he did not know what happened to the deeds after he drafted them, but he intended that each one be signed and recorded, "[o]therwise, a few of the deeds doesn't accomplish anything." Ultimately though, the quitclaim deeds ended up in the possession of Delta Abstract & Title. Ivan asserted that once all the deeds were returned to Hall, they were forwarded to Delta Abstract & Title so it could provide Ivan title insurance. Attorney Hall testified he assumed Delta Abstract & Title was holding the deeds as an escrow agent in anticipation of collecting all of them before finalizing the transaction to convey the West 1/2 to Ivan. Ivan did not recall ever receiving any of the deeds.

On March 18, 1994, Ivan was able to mortgage the West 1/2 to secure a $525,000 loan from First Bank, Upper Michigan. First Bank's mortgage interest in the property was recorded. It is unclear from the parties' arguments whether First Bank relied on the deeds *and* the Scrivener's Affidavit as evidence of Ivan's ownership of the West 1/2 to secure the loan. Attorney Hall testified that on March 17, 1994, the day before the loan was secured, he faxed a copy of the Scrivener's Affidavit to First Bank as evidence of Ivan's ownership of the West 1/2. But there is nothing in the record to indicate that the deeds were also relied on as evidence of Ivan's ownership of the West 1/2.

### D. SETTLING OWNERSHIP OF THE EAST 1/2

The probate court, in Case No. 98-AP-19035, later settled the dispute in ownership over the East 1/2 of the property in December 2018. In that case, Ritter petitioned the probate court, arguing that because the Scrivener's Affidavit would have placed ownership of the East 1/2 back to Matt, the East 1/2 was owned by Matt at the time of his death and should have also been assigned to Helen, and then to Raymond after Helen's death. The probate court relied on MCL 565.451(d)(2)(b) to hold that because Matt died before Hansley signed the Scrivener's Affidavit, the affidavit was invalid.[2] Thus, Ivan was the record title holder to the East 1/2.

### E. CURRENT DISPUTE OVER THE WEST 1/2

On June 30, 2020, Ritter was named Personal Representative of Matt's estate. Ritter also obtained an opinion letter from Delta Abstract & Title, which declared, inconsistent with the probate court's December 2018 opinion, that the East 1/2 belonged to Matt's estate. On June 1, 2021, Ritter brought this action on behalf of Matt's estate to quiet title over the West 1/2 in the probate court, alleging the West 1/2 remains in Matt's estate, and Ivan had no legal or equitable interest in the property to mortgage it to First Bank, so the mortgage should be nullified. At the time, neither party knew of the existence of the six quitclaim deeds from Matt's heirs conveying the West 1/2 to Ivan and Jodi. Ivan then brought a counterclaim against Ritter to quiet title to the West 1/2 by adverse possession. Ivan emphasized that he was able to use the West 1/2 as collateral to secure a bank loan as evidence of his ownership of the property.

On October 14, 2021, Ritter moved for summary disposition under MCR 2.116(C)(8) and (C)(10) on Ivan's counterclaim, arguing there was no allegation in Ivan's complaint to support that the hostility element of adverse possession had been met. Ivan responded, arguing his possession of the West 1/2 was hostile because he used and developed the property against anyone who could claim title to it, including Matt's estate. Ritter's motion was subsequently denied, and trial was set for December 29, 2021.

On the morning of trial, Delta Abstract & Title disclosed to the parties that it found in its warehouse the six quitclaim deeds signed by several of Matt's heirs "portend[ing] to sign off their interest in the property to Ivan Malnar. It's the subject property at issue; mainly the West 1/2 . . . ." Trial was adjourned to allow the parties to amend the pleadings.[3]

On October 21, 2022, Ritter moved for summary disposition under MCR 2.116(C)(10) on her claim to quiet title of the West 1/2 to Matt's estate, and on Ivan's counterclaim to adverse possession of the West 1/2. Ritter's motion made no mention of the newly discovered deeds. On November 18, 2022, Ivan moved for summary disposition on Ritter's complaint under

---

[2] MCL 565.451(d)(2)(b) states that an affidavit of scrivener's error may not "alter the substantive rights of any party unless it is executed by that party." Because the Scrivener's Affidavit altered Matt's ownership of property and he died before its execution, the affidavit was invalid.

[3] Ivan's motion for leave to amend his answer to Ritter's complaint, and his counterclaim, was granted in light of the newly discovered deeds.

MCR 2.116(C)(10), asking the probate court to quiet title to him because of the newly discovered deeds quitclaiming Matt's heirs' interests in the West 1/2 to Ivan. Ivan emphasized that all deeds were signed, notarized, delivered to Delta Abstract & Title, and supported his ownership of the property. He also stated that he was able to mortgage the West 1/2 to secure financing for his business, which operated on the West 1/2, and that he paid real estate taxes on the West 1/2. Ivan argued that his claim to adverse possession of the property was hostile because he occupied the West 1/2 against any claim of interest by any of Matt's heirs and because his operation of a business on the West 1/2 was express notice that he owned the property.

Ivan also responded to Ritter's second motion for summary disposition, arguing the West 1/2 should be considered his property because although the Scrivener's Affidavit was invalid, it evidenced Matt's intent that Ivan was to be record title holder to the West 1/2. Ivan argued further that the several deeds produced by Delta Abstract & Title the morning of trial evidenced his ownership of the West 1/2, so a claim of adverse possession was now an alternative argument to claiming ownership of the West 1/2. Ivan argued that Matt telling him where to locate the sawmill and other buildings makes clear that Matt intended Ivan would hold title to the West 1/2. Ritter responded to Ivan's motion for summary disposition, arguing it must be dismissed as a matter of law because although the deeds were sent to Delta Abstract & Title as an escrow agent, they were never delivered to Ivan and were ineffective at conveying the West 1/2 to him. Ritter also argued the delivery of the deeds to Ivan was conditioned on Ivan providing a quit claim deed of the East 1/2 to Raymond, which never happened. According to Ritter, because the deed was placed with Delta Abstract & Title on the condition that Ivan quitclaim the East 1/2 to Raymond, and the condition never occurred, the deed was delivered "in escrow" and ineffective.

The probate court granted Ivan's motion for summary disposition, dismissing Ritter's claim to quiet title, and denied Ritter's motion for summary disposition on Ivan's adverse-possession counterclaim. The deed from Raymond and Suk showed that it was mailed to their address in Tacoma, Washington, and they executed it before a notary public in Pierce County, Washington on February 17, 1994. The probate court reasoned that even though there was no testimony regarding when Raymond and Suk returned the quitclaim deed to Attorney Hall, the promissory note from First Bank was executed on March 18, 1994, so the deed must have been returned to Ivan or Attorney Hall between February 17, 1994 and March 18, 1994. The court also viewed using the West 1/2 as collateral to secure a loan from First Bank as significant because the loan was a security instrument warranting Ivan owned the property. Regarding whether the deed was delivered, the probate court reasoned that there was no question Raymond and Suk intended to perfect the transfer of the West 1/2 because the deed was mailed from Escanaba, Michigan to Tacoma, Washington, taken before a notary and executed, then sent back to Michigan and stored at Delta Abstract & Title.

And even though the deed was never recorded, the probate court found it significant that the lower left-hand corner of the deed denotes: "When recorded return to: Ivan Malnar," because it put Raymond and Suk on notice that Ivan intended to record it in the chain of title. The bottom of the deed states, "Send Subsequent Tax Bills to Ivan R. Malnar," and Ritter did not refute testimony that Ivan paid the real estate taxes on the West 1/2 as far back as the 1970s. The court held that paying taxes on the property without some agreement to the contrary was akin to ownership. The court found it significant that for the past 40 years, Ivan ran a business on the West 1/2. The court also noted this was not a situation where the grantor executed the deed and

-5-

allowed it to sit in the grantor's desk drawer for years, only to be found years later and become the subject of litigation. Rather, it ended up in the hands of Delta Abstract & Title for the purpose of insuring title to Ivan. The court ultimately held that delivery had been established "by a preponderance of the evidence," and because of this, it did not address Ivan's alternative claim of adverse possession. Ritter now appeals.

## II. ANALYSIS

We review de novo a lower court's decision to grant or deny summary disposition. *Meemic Ins Co v Fortson*, 506 Mich 287, 296; 954 NW2d 115 (2020). A motion for summary disposition under MCR 2.116(C)(10), which tests the factual sufficiency of a claim, is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might disagree." *Johnson v Vanderkooi*, 502 Mich 751, 761; 918 NW2d 785 (2018) (quotation marks and citation omitted). When reviewing the trial court's decision to grant or deny summary disposition under MCR 2.116(C)(10), this Court considers the parties' documentary evidence in the light most favorable to the party opposing the motion. *Johnson*, 502 Mich at 761. "[R]eview is limited to the evidence that had been presented to the circuit court at the time the motion was decided." *Innovative Adult Foster Care*, *Inc v Ragin*, 285 Mich App 466, 476; 776 NW2d 398 (2009).

The moving party may satisfy its burden under MCR 2.116(C)(10) by "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim," *or* by "demonstrat[ing] to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). After the movant has satisfied its burden, the nonmovant's burden to avoid summary disposition is to "go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists." *Id*. at 363. If the nonmovant fails to do so, then the motion is properly granted. *Id*.

While we take issue with some of the probate court's analysis, the court did not err in granting summary disposition to Ivan on Ritter's claim to quiet title. The deeds from Matt's heirs were delivered with the intent to convey a present interest in the West 1/2 to Ivan.

To begin, the probate court was correct that the evidentiary standard for proving delivery of a deed is by a preponderance of the evidence. *Dillon v Meister*, 319 Mich 428, 433; 29 NW2d 846 (1947). The court erred, however, in applying this standard in the context of a summary disposition motion. "[A] trial court may not make findings of fact or weigh credibility in deciding a motion for summary disposition." *In re Handelsman*, 266 Mich App 433, 437; 702 NW2d 641 (2005). The probate court is also required to consider documentary evidence in favor of the nonmoving party. *Id*.

The probate court should have at least acknowledged that there is on this record a letter from Attorney Hall to Ivan indicating that Raymond may have wanted title to some of the estate. Hall wrote to Ivan that "in order to give Raymond good title to a portion of the property from the probate estate, [Ivan] would need to execute a quitclaim deed conveying to [Raymond] all of

[Ivan's] interest in the East 1/2 . . . ." However, even with this letter on the record, the probate court was correct when it observed that "there was no evidence presented regarding what Raymond Malnar's position might have been on this subject property when he was alive." The court was also correct when it concluded that the quitclaim deed, executed by Raymond and Suk, notarized and returned to Michigan, made clear that the intent was to "transfer any interest in the subject property to Ivan Malnar and Jodi Malnar." Therefore, as matter of *law*, there was no issue of material fact. So, despite making unnecessary and impermissible factual findings, the probate court reached the right conclusion. See *Klooster v City of Charlevoix*, 488 Mich 289, 310; 795 NW2d 578 (2011) ("[A]n appellate court may uphold a lower tribunal's decision that reached the correct result, even if for an incorrect reason.").

A. DELIVERY TO A THIRD PARTY AND A LOSS OF DOMINION OR CONTROL

Ritter argues the probate court erred in concluding that delivery occurred because the deeds were returned to Delta Abstract & Title as an escrow agent, which was ineffective to convey title. In Michigan, delivery of a deed is essential to pass title. *Pollock v McCarty*, 198 Mich 66, 72; 164 NW 391 (1917). See also MCL 566.106. The burden of proving delivery remains with the party relying on the deed as evidence of title, in this case, Ivan. *Ligon v City of Detroit*, 276 Mich App 120, 131; 739 NW2d 900 (2007).

While the recording of a deed raises a presumption of delivery, this does not in itself necessarily establish delivery. *Camp v Guaranty Trust Co*, 262 Mich 223, 225; 247 NW 162 (1933). Put differently, recording a deed is not requisite to delivery, and so a deed may be outside the dominion of the grantee and unrecorded but nevertheless be a delivered deed under the law. Specifically,

> [t]he act of delivery is not necessarily a transfer of the possession of the instrument to the grantee, and an acceptance by him, but it is that act of the grantor, indicated either by acts or words or both, which shows an intention on his part to perfect the transaction by a surrender of the instrument to the grantee, or to some third person for his use and benefit. The whole object of a delivery is to indicate an intent upon the part of the grantor to give effect to the instrument. [*Thatcher v Wardens, etc, of St Andrew's Church of Ann Arbor*, 37 Mich 264, 269 (1877).]

Whether a deed is delivered is a question of intent of the grantor to pass title. *McMahon v Dorsey*, 353 Mich 623, 626; 91 NW2d 893 (1953). Delivery is presumed, in the absence of direct evidence, from concurrent acts of the parties recognizing a transfer of the title. Subsequent acts of the grantor and grantee may be considered in determining whether there was intent to pass title. *Schmidt v Jennings*, 359 Mich 379, 384; 102 NW2d 589 (1960).

To begin, we proceed with the understanding that Delta Abstract & Title retained all of the executed and notarized deeds. This is different than the probate court, who, in finding for Ivan, assumed that First Bank relied on the deed Raymond and Suk executed on February 17, 1994, as proof of Ivan's ownership of the West 1/2 before granting a loan. We cannot find any record evidence to support this factual conclusion. The probate court reasoned that even though there was no testimony regarding when Raymond and Suk returned the quitclaim deed to Attorney Hall, because the promissory note from First Bank was executed on March 18, 1994, the deed must have

-7-

been returned to Ivan or Attorney Hall between February 17 and March 18, 1994. But the record only reflects that the Scrivener's Affidavit was used as evidence of Ivan's ownership because it was faxed to First Bank on March 17, 1994, the day before the loan was granted. So there is no genuine issue as to whether the deeds were recorded or returned to Ivan's possession. They were not. But there is likewise no genuine issue as to whether the surviving family members meant to transfer their interests to Ivan.

The facts of this case are most like those of *Thatcher*, 37 Mich at 268-270, *Loomis v Loomis*, 178 Mich 221, 224; 144 NW 552 (1913), and *Cook v Sadler*, 214 Mich 582, 583; 183 NW 82 (1921), where the deed was executed and kept in the hands of a third party but considered delivered nonetheless, and the grantee acted as if they owned the property.

In *Thatcher*, 37 Mich at 268, a deed of trust was signed and executed by the grantor, but left in the hands of the attorney who prepared it. The deed of trust remained with the attorney until the grantor's death, at which point the attorney left the deed of trust at the county register's office to be recorded. *Id*. Our Supreme Court held that this constituted a valid delivery and acceptance of the deed of trust, even though the trustee did not know of the execution of the deed until after the grantor's death. *Id*. at 269-270. In *Loomis*, 178 Mich at 224, our Supreme Court held that where a grantor places the deed with a third party and retains no control over the deed, a valid delivery has occurred, even though the third party is directed not to deliver the deed until after the grantor's death.

In *Sadler*, 214 Mich at 583, Henry and Phila Sadler executed a deed for the east half of their property to their son Franklin, and a deed for the west half to their son Edwin, and placed both deeds in the hands of a neighbor with instructions to deliver the deeds to Franklin and Edwin when both parents died. After the deeds were sent to the neighbor, Edwin made substantial improvements to the property. Edwin died, predeceasing his parents and leaving behind his widow Marie. Not long after Edwin's death, Henry sent Marie to retrieve the deed to Edwin from the neighbor. When Maria retrieved the deed, Henry destroyed it, and he and Phila executed a deed conveying the west half to Marie. The new deed was placed in the hands of a different neighbor, with instructions that it be delivered to Marie when Henry and Phila died. A year after this, Marie remarried and went to live in Canada. Henry destroyed the second deed to Marie and executed a third deed conveying the west half to Franklin. Edwin's heirs challenged the third deed many years later, arguing the west half should belong to them and not Franklin's heirs. *Id*. at 584.

Our Supreme Court in *Sadler* held:

> where a grantor makes a deed to another and deposits the deed with a third party, to be held by such party until the grantor's death, and to be delivered to the grantee named in the deed, the grantor reserved no dominion or control over the deed during his lifetime, a valid delivery is thereby made, and an immediate estate is vested in the grantee, subject to a life estate in the grantor." [*Id*. at 586 (citation omitted).]

The *Sadler* Court observed that at the time the first deed to Edwin was deposited with the neighbor, no conditions were attached to the deed indicating Henry and Phila intended to retain any control over it or recall it, and they made no effort to control it while Edwin was alive. The *Sadler* Court also found it significant that after the first deed to Edwin was deposited with the neighbor, he

-8-

finished building his house on the west half, erected fences, and planted an orchard, which indicated there was an understanding between him and his parents that he should own the west half. *Id*. at 587. The *Sadler* Court held Henry had no legal right to destroy the first deed to Edwin after placing it in escrow with the neighbor because the deed was delivered at the time it was placed with the neighbor, and Edwin's interest in the west half vested immediately upon that delivery. *Id*. at 585, 589.

Likewise, the deed from Raymond and Suk was placed beyond their control. Here, a deed drafted by Attorney Hall was sent to Raymond and Suk in 1990 with directions to execute it and return it to his office. The deed did not reach Raymond and Suk because of their change of address, so it was resent to them in Tacoma, Washington in 1994. Raymond and Suk executed and notarized the deed on February 18, 1994. The bottom of the deed stated, "When Recorded Return To: Ivan Malnar" although Attorney Hall was to receive it on Ivan's behalf. Raymond and Suk "reserved no dominion or control" over the deed because, although Attorney Hall did not remember ever receiving the deed, and assumed Delta Abstract & Title was holding it as an escrow agent, the deed's final destination was in a storage warehouse belonging to Delta Abstract & Title where it was not discovered until 2021. *Sadler*, 214 Mich at 586.

Importantly too, and contrary to one of Ritter's arguments in this Court, the deed transferred the property unconditionally to Ivan. When the deed conveying the West 1/2 was sent for Raymond and Suk to sign, the deed, and the letter forwarding the deed, did not contain any language that delivery of the deed, or its effectiveness in conveying title of the West 1/2 to Ivan, be conditioned on Ivan conveying title of the East 1/2 to Raymond. There is no condition in the deed from Raymond and Suk to Ivan and Jodi, and the deed is considered delivered without Ivan needing to execute a quitclaim deed conveying the East 1/2 to Raymond.

## B. BEHAVIOR AND ACTIONS AS EVIDENCE OF DELIVERY

As referenced above, a court can properly consider actions taken on the property in question in determining whether title has been effectively transferred. In *Sadler*, the court observed that before his death, Edwin built a home and maintained an orchard. In *Haasjes v Woldring*, 10 Mich App 100, 101-102; 158 NW2d 777 (1968), two grandparents executed a deed to property to two grandchildren. The grandparents continued to live on the property, pay taxes on it and after the execution of the deed, they made statements which this Court found inconsistent with a prior transfer of property. These circumstances, combined with the fact that the deed was not placed beyond the grandparents' control, led the *Haasjes* Court to conclude that a valid transfer of title had not been effected. *Id*. at 102-103.

Up until 2018 when the Scrivener's Affidavit was deemed invalid, all parties were operating under the assumption that Ivan had title to the West 1/2 since August 1990 when the affidavit was executed. The Scrivener's Affidavit certainly speaks to the parties' intent even if deemed invalid. And despite Ritter's present challenges to the same, the probate court correctly considered Ivan's decades-long record of paying property taxes on the West 1/2. Payment of property taxes is a valid factor to consider in determining a possessor's intent to claim title to property. *Seifferlein v Foerster*, 218 Mich 179, 187; 187 NW 602 (1922). But the probate court considered payment not as evidence of ownership, but as a subsequent act of the grantee that shed light on determining whether delivery occurred, i.e. the parties acted as if delivery occurred.

*Schmidt*, 359 Mich at 384. The court made sure to state the analysis of who paid taxes on the property "is not critical to the delivery issue," indicating its decision did not depend on who paid property taxes. Ivan paying taxes on the property, and erecting buildings on the property, just like Edwin in the *Sadler* case did, "gives color to the claim that an understanding between him and [Matt] that he should have" the West 1/2 as his own. *Sadler*, 214 Mich at 587.

For these reasons, the probate court did not err in holding that there was no genuine issue of material fact as to whether the quit claim deeds were delivered sufficient to effectuate the transfer of title of the West 1/2 to Ivan. We affirm the probate court's order granting Ivan summary disposition on Ritter's claim to quiet title. Like the probate court before us, because we decide this case based on effective delivery, we need not consider Ivan's counterclaim to ownership by adverse possession.

### III. CONCLUSION

We affirm the probate court's order granting summary disposition to Ivan regarding whether the deeds were delivered sufficient to quiet title of the West 1/2 to him.

/s/ Brock A. Swartzle
/s/ Kirsten Frank Kelly
/s/ Adrienne N. Young